## Fraley v. Bispham.

Where a sale with samples was made of tobacco, which was stated in the bill of parcels to be "superior sweet-scented Kentucky leaf tobacco;" such a statement affords no evidence from which a jury may infer a warranty, that it was either superior or sweet-scented. And the seller is not liable in an action *ex contractu,* if it was Kentucky leaf tobacco, though of a very low quality, ill-flavoured, unfit for the market, and not sweet-scented.

A letter from the vendee to the vendor, averring that goods had been bought under a guaranty that the vendor would reimburse the vendee any loss that might be sustained, together with an enclosed account, showing the extent of the loss— not replied to, are no evidence on a count upon an account stated.

In error from the District Court of Philadelphia.

*April* 25. The plaintiffs in this action declared upon a warranty by the defendants, on the sale of certain tobacco, that it was superior sweet-scented Kentucky leaf tobacco; on a promise to reimburse the defendants for any loss that might occur on a sale of the tobacco by defendants; and on an account stated. On the trial before Jones, P. J. the plaintiffs gave in evidence the bill of parcels, as follows:

"Messrs. Reeves, Buck & Co. (the plaintiffs) bou't of Samuel Bispham, 50 hhds. superior sweet-scented Kent'y leaf tobacco."

Then followed the weights of the several hogsheads, and at the foot of, or accompanying the bill, was the following:

" Please let me know when and where you will have the above tobacco, and as our porters understand it, they can get the same out of the warehouse better than strangers. The charge is 25 cents porterage and 1¼ outage, and the certificates given up to the inspector. Yours, &c.  S. B."

The plaintiffs then offered to read the depositions of one of their consignees at Liverpool, who said that he had requested William Oxley to examine the samples of the tobacco, and of another of the firm, who said that he had examined the samples carefully, and that the tobacco was Kentucky leaf of exceeding bad quality, low, faded, and rotten; that the said tobacco was not superior sweet-scented Kentucky leaf.

Oxley stated he had, at the request of the consignees, examined some samples of tobacco, believed to be that above alluded to ; he found it Kentucky leaf tobacco of very low quality, ill-flavoured, and mostly heated, and quite unfit for the consumption of that country; that the tobacco was not sweet-scented Kentucky leaf tobacco, but quite the reverse. This evidence was rejected. The plaintiff then proved by Buck that the usage in Philadelphia is, if an article is not sold by sample, with such a heading, an allowance is made if it does not correspond with the heading. He further stated that the custom of the trade here is to sell by samples, which are drawn by the inspector: and it seemed from the charges for boxes for samples, that the sale in this case was made by sample.

The plaintiffs then offered in evidence under their count on an account stated, an account sent to defendant, in which the cost and charges and the nett proceeds of the tobacco resulted in a loss of $1,690 ; accompanied with a letter from them to defendant, in which they said : "Having received an account of the sales of 50 hhds. of tobacco, purchased from you last September, under a guaranty that you would reimburse us for any loss which we might sustain by that shipment, we now annex a statement of our claim for loss, amounting to $1,690, to the settlement of which we ask your early attention ;" and another letter, stating that they had written to him on the subject of this tobacco, "purchased under a guaranty that the quality of the article was superior, and that you would reimburse us for any loss we might sustain by the shipment. We then exhibited our claim, amounting to $1,690, arising from the very inferior quality of the tobacco, it being, according to our letters from Liverpool, the meanest lot which had been seen there for many years," and requesting payment and a reply. These letters were sent—the one about a year, the other about three

months before suit was brought—and, as it appeared, had not been replied to.

This evidence was rejected, and the plaintiffs nonsuited.

*G. W. Biddle*, for plaintiffs in error.—The case generally cited first on these questions is Chandelor *v.* Lopus; but that was a mere question of pleading; the whole case proceeded on the ground that the plaintiff had not declared on a warranty. It has been supposed to decide there can be no warranty without express words. The rule of the civil law, that a sound price implies a sound article, is not contended for; nor is it sought to interfere with the rule, that where nothing is said, it suffices if the article exists in specie. But, if the vendor undertakes to say anything, and induces the vendee to rely on the assertion, he is bound by it, for the vendee may presume it is so, and is not bound to examine. It will be observed, the question is not whether this evidence is conclusive that a warranty existed, but whether the jury might infer from it, that a warranty was intended as to *kind* or *quality*. Now it is settled that no form of words is essential: "I warrant" is usual, but "I represent," "I affirm," will answer equally well, and it can scarcely be doubted, that if Chandelor *v.* Lopus was to be decided now, the court would hold, "I affirm the stone to be a bezoar stone," to amount to an allegation of warranty that it was so. Great brevity is used in all mercantile contracts, and the heading of the bill of parcels, which is evidence of the parol contract, may read, "I affirm this tobacco to be superior sweet-scented Kentucky leaf tobacco." This further appears from the letters of the plaintiffs; they there call it a guaranty; the evidence is distinct that it was neither superior sweet-scented, nor sweet-scented at all; the witness says, it was quite the contrary. So that the case is narrowed to this inquiry, is there any evidence, from which a jury might infer a warranty as to kind or quality? To say that it is tobacco, is nothing. The various kinds of tobacco rank as different articles of merchandise. The cases bear out this view. In 4 Camp. 144, a description of goods in a written contract was held to imply a warranty they are merchantable under that denomination, and the exhibition of samples does not qualify the rule. To the same effect is 6 Taunt. 446, where the warranty arose from a description in the heading of a sale-note. 5 Bing. 533, decides that no particular form of words is essential, but that a seller, knowing the qualities of the animal, undertakes they are those expressly required by the purchaser. In 2 Bing. N. C.

668, a contract to sell mess pork of S. & Co., was held to mean pork manufactured by S. & Co.; and there also the warranty arose from a description in the sold-note. In 4 Ad. & El. 473, the heading of a bill of parcels of pictures, containing the name of the artist, was held to be evidence of a warranty they were painted by such artist. In 2 Pick. 214, the sale-note "of prime quality winter oil" was held a warranty that it was winter, and not summer-strained oil. The difference between these is no greater than in the tobacco, as sold, and as it existed in this case. In 7 S. & R. 480, and Chapman *v.* Murch, 19 John. 290, the same error was committed by the judge at Nisi Prius, in withdrawing the evidence from the jury. In the former, by telling them that a representation was an express warranty; in the latter, by telling them it was not evidence from which they might infer a warranty. In both cases it was for the jury to draw an inference of warranty, as was held in 2 Car. & Pay. 211. The error in putting a legal construction upon oral words is pointed out in 9 W. 59. In 3 W. C. C. 165, there was no representation at the time of the sale, and in 3 R. 168, the article, though adulterated, was known in the market in that condition, under the name by which it was sold, and was, in fact, never sold in a pure state. 3 R. 23 is the leading case, and the principle is, that an affirmation of a material fact binds the vendor to its truth, and it is immaterial that the sale is by sample: Pet. C. C. 225. The letters and the accounts corroborated the evidence of warranty from the bill of parcels, and were also evidence of an account stated, the defendant not replying to the allegations: 3 C. & Pay. 103; 2 Greenl. Ev. § 126; 1 Ib. § 197; Bald. 536; 3 W. & S. 109; 2 Barr, 323.

*L. A. Scott* and *Scott*, contrà.—The evidence shows the sale was by sample, and there is no count alleging a difference between the samples and the article sold. It is, moreover, proved that the tobacco was in kind the article said to be sold. It was Kentucky leaf tobacco certainly. Whether there was a warranty of the quality, is the only question. This seems to be settled in this state. 3 W. C. C. R. 165 was an advertisement of white glass—held no warranty. 7 S. & R. 480 decides the very point—the seller is not bound to answer for the goodness of wares, unless there be an express warranty or fraudulent representation; and it is there said, "from the time of Chandelor *v.* Lopus, the doctrine has been that a bare affirmation of quality will not give an action, unless the vendor knew it not to be as represented." 3 R. 23 was to the

same effect—the case being a sale of dirt as blue paint, and it was put on the fact that there was not a correspondence in kind.   3 R. 168 was a case of an adulterated article, and yet, because it was known in the market under the name by which it was sold, there was no warranty.   In 9 W. 55, it was held no implied warranty arises from a false affirmation; the only remedy is an action for deceit; nor is the affirmation evidence of the warranty.   These cases establish the rule of this state, and must govern, though other laws differ.   4 Camp. 144 was, however, a case turning on the difference in kind in the market.   6 Taunt. 446 turned chiefly on the admissibility of the usage, nor can it be discovered how the plaintiff counted.   In 5 Bing. 533, there was parol evidence of the warranty.  · 3 Bing. N. C. 668 and 4 A. & E. 473 were on the differences in kind.   So was 2 Pick. 214.

The letters, &c., were offered under the count on an account stated.   But they afforded no evidence of that.   An account stated must mean a statement of dealings admitted to have occurred, resulting in an admitted balance, not a claim on a promise not proved: otherwise every letter demanding payment, on whatever ground, will become an account stated, if not replied to.   In 1 T. R. 40, an account stated is said to be an agreement by both parties that all the articles are true, and the consent of both parties must clearly appear.   It is not every neglect to answer which turns an account delivered into an account stated: 4 W. & S. 14, 1 Sim. & St. 333; nor are the letters, though unanswered, any evidence of the facts therein stated: 1 Mood. & Rob. 2; 9 Car. & Pay. 221; 3 Ib. 103; 3 M. & M. 607; 5 Ib. 656; 1 Cr. M. & Ros. 29.

*April* 27.   COULTER, J.—This cause was closely argued, and with much ability.   But, after all, the court are of opinion that no warranty was established which was competent to go to the jury, under either of the counts in the *narr.*   The cause seems to be conclusively governed by the case of Borrekins *v.* Bevan, 3 R. 23, in which the doctrine of Chandelor *v.* Lopus, Cro. Jas. 4, is dismissed with disapprobation, and the rule established that, in all sales of goods by bills of parcels, samples, &c., there is an implied warranty, that the article delivered shall correspond in specie with the commodity sold, unless there are facts and circumstances to show that the purchaser took upon himself the risk of the *kind* as well as the *quality* of the commodity purchased.   If that case means anything, it means this, that when the thing is sold by sample, and without express warranty, the purchaser takes it at his own risk, unless it

should prove to be an article different in kind; all gradations in quality are at the hazard of the buyer. But if an article was sold as a diamond, and turned out to be glass, or when the thing was sold as tea, and was, in fact, chaff, the vendor would be responsible; thus rendering the seller liable for a difference in kind, but not for a difference in quality. Whether the rule in Chandelor and Lopus, to wit, *express warranty or fraud*, in all cases, both as to kind and quality, was better than the one established in Borrekins v. Bevan, is a matter of little import now. It is useless to wander darkling among the dust and mist of old cases, to determine which was best, or most authoritatively recognised. Borrekins v. Bevan has been repeatedly acknowledged by this court, and is now the law; that is sufficient. Let us test this case by it. The sale by the bill of parcels, with which perhaps the sample corresponded, was of sweet-scented Kentucky leaf tobacco. It is not pretended that the article delivered was not tobacco, nor that it was anything else than Kentucky leaf tobacco. But, it is alleged and proved, that it was of inferior quality, and perhaps not very sweet-scented. The witnesses examined at Liverpool say that it was of a low, mean quality. The gist of the whole case, on the part of the plaintiffs, is, that the tobacco delivered was not of a quality equal to the sample, but of inferior flavour, taste, and quality.

It was in specie Kentucky leaf tobacco, in kind the same as the article sold.

Indeed, the gravamen of the plaintiffs' *narr.*, and the allegation in their own letter is, that the article delivered was inferior in quality to that sold by sample and bill of parcels. And in such cases, by the law of this state, as well established, there being neither express warranty nor imputed fraud, the risk falls on the buyer.

The court were right in rejecting the paper containing the claim of the plaintiffs, although it had been sent to defendant before suit brought. It was not competent evidence on the count of *insimul computassent*, or account stated, and it was not offered on any of the other counts.

I regard the paper as nothing more than a specification of damages, sustained upon an alleged breach of contract, on the part of defendant, of which the defendant was bound to take no notice, by the usages of trade, or mercantile law. He resisted the whole claim. *Insimul computassent* is a writ that lies between two merchants or other persons, upon an account stated between them. In such

case the law implies, that the one against whom the balance appears, has engaged to pay it to the other, although there be no actual promise. But here is no account between the parties—no *insimul computassent ;* nothing but a *contract* between the parties, in regard to a particular thing or transaction ; and which contract the plaintiffs say the defendant has broken, and send him a written specification of losses or damages. The defendant denies that he has broken his contract. It is not a case of account; no case was produced, and I apprehend none can be, that the *insimul computassent* extended to damages for breach of contract alleged, where there had been no actual settlement or adjustment between the parties. We perceive no error in the record.

Judgment affirmed.